# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Joseph A. Dickson |
| v. | : | Mag. No. 14-6800 |
| KEILA RAVELO and MELVIN FELIZ | : | **CRIMINAL COMPLAINT** |
| | : | Filed Under Seal |

I, Daniel Garrido, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

SEE ATTACHMENT A

I further state that I am a Special Agent with the Internal Revenue Service, and that this complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached page and made a part hereof.

_____
Daniel Garrido, Special Agent
Internal Revenue Service

Sworn to before me and subscribed in my presence,

December 19, 2014                    at Newark, New Jersey


HONORABLE JOSEPH A. DICKSON          _____
UNITED STATES MAGISTRATE JUDGE        Signature of Judicial Officer

## ATTACHMENT A

From in or about 2008 through in or about July 2014, in the District of New Jersey and elsewhere, defendants KEILA RAVELO and MELVIN FELIZ did knowingly and intentionally conspire and agree with each other and others to devise a scheme and artifice to defraud two law firms and a client thereof, and to obtain money and property from the law firms and a client thereof by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice to defraud, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, contrary to Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Section 1349.

ATTACHMENT B

I, Daniel Garrido, am a Special Agent with the Internal Revenue Service. I am familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and other evidence. Because this Complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where statements of others are related herein, they are related in substance and in part unless otherwise indicated. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

Background

1. At various times relevant to this Complaint:

   a. Defendant KEILA D. RAVELO ("defendant RAVELO") and defendant MELVIN FELIZ ("defendant FELIZ") resided in New Jersey and maintained a joint bank account (the "Joint Bank Account").

   b. Defendant RAVELO was an attorney who practiced law in New York.

   c. "Law Firm 1" was a law firm in New York. Defendant RAVELO was a partner at Law Firm 1 from prior to 2008 to approximately October 1, 2010.

   d. "Law Firm 2" was a law firm in New York. Defendant RAVELO was a partner at Law Firm 2 from approximately October 1, 2010, to and through approximately November 14, 2014.

   e. "Client 1" was a client of Law Firm 1 during the time period when defendant RAVELO was a partner at Law Firm 1 and was a client of Law Firm 2 during the time period when defendant RAVELO was a partner at Law Firm 2.

   f. "Vendor 1" was a limited liability company that was formed in or about January 2008. Vendor 1 purportedly provided millions of dollars in litigation support services to Law Firm 1 and Law Firm 2 and received payments of more than $5,000,000 from Law Firm 1 and Law Firm 2 for these alleged services. In reality, however, Vendor 1 provided little or no services to Law Firm 1 and Law Firm 2. Moreover, the majority of the money that went into Vendor 1's bank account from Law Firm 1 and Law Firm 2 was either: (i) transferred directly out of Vendor 1's bank account to pay for defendant RAVELO's or

defendant FELIZ's personal expenses, or (ii) transferred into the Joint Bank Account.

      g.   "Vendor 2" was a limited liability company formed in or about April 2011.  Vendor 2 purportedly provided services to Law Firm 2 and received payments in excess of $750,000 from Law Firm 2 for these alleged services.  In reality, however, Vendor 2 provided little or no services to Law Firm 2.  Moreover, the majority of the money that went into Vendor 2's bank account from Law Firm 2 was either: (i) transferred directly out of Vendor 2's bank account to pay for defendant RAVELO's or defendant FELIZ's personal expenses, or (ii) transferred into the Joint Bank Account.

      h.   Records obtained for the Joint Bank Account reveal that the majority of the funds in the account were used to pay for the personal expenses or investments of defendant RAVELO and/or defendant FELIZ.

### Summary of the Investigation

2.   The Internal Revenue Service and Drug Enforcement Administration have been conducting an investigation into the fraudulent activity of defendant RAVELO and defendant FELIZ.  As explained in more detail herein, the investigation has revealed that defendant RAVELO worked for Law Firm 1 and Law Firm 2 on matters involving Client 1.  The investigation also revealed that defendant RAVELO and defendant FELIZ either created or caused Vendor 1 and Vendor 2 to be created, including having bank accounts opened in Vendor 1's and Vendor 2's names, and thereafter controlled payments out of these bank accounts.  The investigation further revealed that defendant RAVELO and FELIZ then used Vendor 1 and Vendor 2 to fraudulently obtain money from Law Firm 1, Law Firm 2, and Client 1 by submitting or causing the submission of invoices for work that was not performed.  Moreover, the investigation has revealed that the majority of the fraudulently obtained funds were used to pay for the personal expenses and investments of defendant RAVELO and defendant FELIZ.

### The Fraudulent Activity

3.   Prior to 2008, defendant RAVELO joined Law Firm 1 as a Partner.  Defendant RAVELO thereafter worked on a litigation matter concerning Client 1.

4.   Records demonstrate that between approximately January 25, 2008, and approximately November 23, 2010, Law Firm 1 paid Vendor 1 more than $2,000,000 for litigation support services.  Defendant RAVELO, in her capacity as a partner at Law Firm 1, approved many, if not all, of the payments

from Law Firm 1 to Vendor 1. The investigation has revealed that Vendor 1 provided little or no services to Law Firm 1.

5. On or about October 1, 2010, defendant RAVELO joined Law Firm 2 as a Partner. Defendant RAVELO thereafter worked on the same litigation matter concerning Client 1 while at Law Firm 2.

6. Records demonstrate that between approximately September 1, 2010 and August 2014, Law Firm 2 paid Vendor 1 more than $2,000,000. Defendant RAVELO, in her capacity as a partner at Law Firm 2, approved many, if not all, of the payments from Law Firm 2 to Vendor 1. The investigation has revealed that Vendor 1 provided little or no services to Law Firm 2.

7. Over the course of this investigation, law enforcement officers have identified and spoken with individuals allegedly employed by and/or associated with Vendor 1 and/or Vendor 2. For instance, law enforcement officers interviewed the individual who opened the bank account in the name of Vendor 1 ("Individual 1"). Individual 1 stated that: (a) defendant FELIZ flew Individual 1 to Nevada; (b) while in Nevada, defendant FELIZ had Individual 1 open a bank account for Vendor 1; (c) Individual 1 thereafter provided signed blank checks associated with the account Individual 1 had opened for Vendor 1 to defendant FELIZ; and (d) Individual 1 did not have any substantive involvement with any business activity of Vendor 1.

8. Records also demonstrate that between approximately May 18, 2011, and August 17, 2012, Law Firm 2 paid Vendor 2 more than $750,000. For instance, on January 24, 2013, Law Firm 2 caused an interstate wire transfer, which wire transfer was routed through New Jersey, to be sent to Vendor 2's bank account. Defendant RAVELO, in her capacity as a partner at Law Firm 2, approved many, if not all, of the payments from Law Firm 2 to Vendor 2. The investigation has revealed that Vendor 2 provided little or no services to Law Firm 2.

9. Law enforcement officers interviewed the individual ("Individual 2") who opened the bank accounts in the name of Vendor 2. Individual 2 stated that defendant RAVELO incorporated Vendor 2. Individual 2 further stated that Individual 2: (a) opened bank accounts in New Jersey for Vendor 2 at the request of defendant RAVELO; (b) provided signed blank checks associated with an account Individual 2 had opened for Vendor 2 to defendant RAVELO; (c) caused wire transfers to be sent or checks to be issued from Vendor 2's bank accounts at defendant RAVELO's instruction; and (d) did not have any substantive involvement with any business activity of Vendor 2.

10. Law enforcement officers have also interviewed employees of Law Firm 2, including several who stated they spent substantial time working with

defendant RAVELO on matters for Client 1 during the timeframe of the conspiracy. These employees each stated that during the timeframe of the conspiracy alleged herein they reviewed no work product produced by Vendor 1 or Vendor 2 to the best of their recollection.

11. Records obtained during the investigation, including those concerning the Joint Bank Account, reveal that some wire transfers and or checks were issued to others for allegedly performing litigation support work. Law enforcement has interviewed some of these individuals, who have all stated that they never performed any legal or litigation support work during the timeframe of the conspiracy for Vendor 1 or Vendor 2. For example, Vendor 1 issued three checks totaling $12,500 in the name of Individual 3 for allegedly performing litigation support work. Individual 3 stated, however, that she was never employed by nor did she perform any work for Vendor 1.

12. After Law Firm 1 and Law Firm 2 provided payments to Vendor 1 and Vendor 2, the bulk of those proceeds were subsequently transferred to an account which defendant RAVELO and defendant FELIZ controlled. More specifically, records for Vendor 1 and Vendor 2's bank accounts show that the bank accounts were used to transfer more than $4,000,000 to the Joint Bank Account.

13. Records for the Joint Bank Account reveal that the majority of the funds in the account were used for personal investments or expenses, including numerous apparent payments to a jewelry store in the combined amount of approximately $250,000.